UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

```
x- - - - - - - - - - - - - - x
IN THE MATTER OF:             . Case No. 22-14539(JKS)
                              . Chapter 11
NATIONAL REALTY INVESTMENT    . Newark, New Jersey
ADVISORS, LLC                 .
                              .
          Debtor,             . DATE: October 29, 2024
- - - - - - - - - - - - - - - .
AIRN LIQUIDATION TRUST CO., LLC.
                              . Adv. No. 24-01456
        -vs-                  .
                              .
WIPFLI LLP,                   .
- - - - - - - - - - - - - - - .
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JOHN K. SHERWOOD
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

```
For Liquidation Trust:   ICE MILLER LLP
                         BY:  JESSA DEGROOTE, ESQ.
                              LIBBY P. MOYER, ESQ.
                         1500 Broadway, Suite 2900
                         New York, NY  10036

For WIPFLI LLP:          LOWENSTEIN SANDLER LLP
                         BY:  NICOLE FULFREE, ESQ.
                         One Lowenstein Drive
                         Roseland, New Jersey 07068

                         GODFREY & KAHN SC
                         BY:  DANIEL T. FLAHERTY, ESQ.
                         200 South Washington Street, Suite 100
                         Green Bay, WI 54301
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**TRACY GRIBBEN TRANSCRIPTION, LLC**
**P.O. Box 688**
**Middletown, NJ 07748**
**(800) 603-6212**
**(732) 263-0044    Fax No. (732) 865-7179**
www.tgribbentranscription.com

# I N D E X

ORAL ARGUMENT (Motion to Dismiss)          PAGE

BY MR. FLAHERTY                            4/32

BY MS. DEGROOTE                           12/47

DECISION                                  (Reserved)

1          THE COURT:  Do you know if anyone is appearing by

2     Court Solutions today?

3          MS. DEGROOTE:  As far as we know for the trust, no,

4     no one is on Court Solutions.

5          UNIDENTIFIED:  I don't believe so, Your Honor.

6          THE COURT:  Okay.  All right, so those is AIRN versus

7     WIPFLI and others.  Let me have the appearances to start.

8          MS. DEGROOTE:  Good afternoon, Your Honor, my name is

9     Jessa DeGroote.  I'm from the law firm Ice Miller.  We

10     represent the AIRN Liquidation Trust Co. and the trustee for

11     the trust.  I'm here with my colleague, Libby Moyer.

12          THE COURT:  Welcome.

13          MS. DEGROOTE:  Thank you.

14          MS. FULFREE:  Good afternoon, Your Honor, Nicole

15     Fulfree on behalf of defendant, WIPFLI LLP and here with me

16     today is my co-counsel, Dan Flaherty from Godfrey Kahn.  His

17     pro hac application was filed this morning at docket number 15.

18          THE COURT:  Welcome.

19          MR. FLAHERTY:  Good afternoon, Your Honor.

20          THE COURT:  All right, this is WIPFLI's motion to

21     dismiss.  Why don't we get started with the movant?

22          MR. FLAHERTY:  Thank you, Your Honor, may it please

23     the Court.  I know there may have been a little confusion about

24     whether this hearing was going on this afternoon or not and I

25     want to be respectful of the Court's time and resources.  I

1    never make it a practice to regurgitate what is in our briefs

2    at the time of an oral argument on a motion so I will hit a

3    couple of high points for the Court's consideration --

4              THE COURT:  Yes, I've had a full motion calendar

5    today and a cash collateral contested so take all the time you

6    need.

7              MR. FLAHERTY:  Okay.  I just want to kind of repeat

8    the arguments in the brief because --

9              THE COURT:  Go ahead.

10             MR. FLAHERTY:  -- because they're fairly extensive

11   but --

12             THE COURT:  And I did prep for this extensively when

13   it was first on.

14             MR. FLAHERTY:  Great.  So as you know Judge, we filed

15   a motion to dismiss the claims against WIPFLI.  We believe that

16   based on the allegations in the complaint all claims against

17   WIPFLI should be dismissed on the grounds of in pari delicto.

18   It is well established that the trustee stands in the shoes of

19   NRIA for purposes of in pari delicto and this trust has not

20   been "cleansed" of NRIA's wrongdoing because it is asserting

21   investor claims.

22             That's one of the arguments that NRIA made in

23   opposition to our motion.  And we would direct the Court's

24   attention to cases decided by the Eighth Circuit last month,

25   Kelley v. BMO Harris Bank which is the case arising from the so

1    called Petters Ponzi Scheme, one of the largest Ponzi schemes

2    in the history of the US and the Eighth Circuit there rejected

3    claims very similar to the claims that we're confronting here

4    on behalf of investors.

5         And I would urge the Court to act sooner rather than

6    later because in that Kelley v. BMO Harris Bank case, the

7    Eighth Circuit acted only after there had been years and years

8    and years of litigation, a trial, a jury verdict and I can only

9    speculate as to the millions and millions of dollars that were

10   spent seemingly unnecessarily when the Court in the Eighth

11   Circuit not only reversed the decision of the underlying court

12   but entered an order to dismiss with prejudice.  Significantly

13   --

14        THE COURT:  That's the Eighth Circuit.

15        MR. FLAHERTY:  It is the Eighth Circuit, Judge, but

16   you can look no farther in the Laugherty (phonetic) here in the

17   Third Circuit which is still good law and --

18        THE COURT:  Yes, I'm still looking at Laugherty just

19   so --

20        MR. FLAHERTY:  You don't have to look beyond

21   Laugherty.  It's good law.  It has been cited repeatedly by

22   other Circuits around the country including the Eighth Circuit

23   in the decision issued in September of last year.  It's still

24   good law.  And another primary argument, Judge, is Laugherty we

25   think should be dispositive on in pari delicto doctrine which

1   we think undermines the legitimacy of the claims asserted

2   against WIPFLI.

3         As I mentioned a moment ago, the trustee has argued

4   that there was a so called cleansing event which could save it

5   from the enforcement of the in pari delicto doctrine.  The

6   complaint we're looking at, Judge, has absolutely no

7   allegations about a change in a corporate management.

8         What the trustee has done in response to our motion

9   is encouraged you to look far beyond the four corners of the

10  complaint utilizing the corporation by reference concept which

11  we think is stretching the band way too far in this instance.

12  Inasmuch as they trenched far into other proceedings and other

13  jurisdictions to make an argument that WIPFLI should be on

14  notice that there was a "cleansing event" that would otherwise

15  impede the in pari delicto doctrine's enforceability or

16  applicability here.

17        THE COURT:  Well, even if, they didn't plead it but I

18  had this case from the beginning.  I know that Mr. Casey came

19  in as new management months before the petition was filed and

20  Grabato and Salzano were done.  I can always tell them to amend

21  the complaint to add that but I know it.  It happened.

22        MR. FLAHERTY:  Well, if you look at what's in the

23  complaint, Judge, they affirmatively alleged that NRIA was

24  still raising money months after Casey was here.  They alleged

25  in their complaint that we're facing in this proceeding that

1    they were still raising money in January of 2002 months after

2    Casey was appointed.  And in the allegations in the complaint

3    that we're facing, it says that Grabato and Salzano were only

4    out shortly before the filing of the bankruptcy.  You've got

5    much greater familiarity than I do, Judge, with what the

6    timeline is here, but the allegation in the complaint have no

7    reference to a cleansing or intervening management that could

8    be utilized for purpose of trying to beat back the in pari

9    delicto doctrine.  And in fairness, Judge, --

10          THE COURT:  But if they plead it, would you agree

11   that it works?

12          MR. FLAHERTY:  I would have to see the pleading and I

13   think at a minimum, they should be forced to amend here because

14   the complaint that we're facing is facially deficient as it

15   relates to in pari delicto and at a bare minimum I would urge

16   the Court to compel them to amend and we have other bases we're

17   going to argue in a moment for other claims that are in the

18   case but we should have a fair notice of exactly what the

19   claims are that we're looking at here as opposed to allegations

20   that would not on their face make it past the in pari delicto

21   form of the defense.

22          You know we think that moving away from in pari

23   delicto for a second, Judge, to the New Jersey Securities Law,

24   we have argued that WIPFLI was neither an agent as that term is

25   defined under the statute nor did WIPFLI make representations

1   that could have been relied on by any prospective investor.

2   The trustee really has not responded cogently to the arguments

3   it was not an agent and was not making, and we were making

4   representations that they could rely on.  Similarly, as it

5   relates to the malpractice claim, the trustee has to, they have

6   to pick, either the claim on behalf of the debtor or on behalf

7   of the investors.

8           They can't have it both ways which is what they've

9   done thus far and that is not consistent with the New Jersey

10  Malpractice Law which requires that we know who we owe a duty

11  to.  If you don't know who you owe a duty, you can't breach

12  that duty and we also have to know what the misrepresentations

13  were that allegedly give rise to the potential malpractice

14  under the statute.

15          They can't have it both ways.  They can't argue that

16  it's both a duty to the debtor as well as a duty to the

17  investor.  They need to pick one or the other to try and

18  proceed on.  And finally, Judge, with respect to the unjust

19  enrichment, we think that along with the other claims should

20  fail based on the allegations we have in this complaint.  The

21  last thing I'll point out is as we mentioned in the conclusion

22  of our reply brief, we're scratching our head a little bit

23  about the situation involving Joseph Cipolla and Cipolla &

24  Company that recently had nearly identical claims against that

25  accounting firm dismissed by the trustee.  I know counsel for

1    Cipolla is in the courtroom as we sit here today.

2             But we can't see any reason why claims against

3    Cipolla nearly identical to claims against WIPFLI would be

4    dismissed and yet we're still facing the same arguments from

5    the trustee today.

6             THE COURT:  They weren't dismissed on the merits.

7             MR. FLAHERTY:  They were not.  They were dismissed by

8    way of an amended complaint.

9             MS. DEGROOTE:  Your Honor, they were dismissed

10   without prejudice at this time so I wouldn't say it was a

11   dismissal on the merits or not on the merits.  There's ongoing

12   discussions between the trustee and Cipolla's counsel --

13            THE COURT:  I didn't realize you dismissed the

14   adversary?

15            MS. DEGROOTE:  No, I'm so sorry.  The adversary is

16   not dismissed.  The single claim for the accounting malpractice

17   was dismissed without prejudice against Cipolla at this time.

18            MR. FLAHERTY:  Actually, it's multiple claims, Your

19   Honor, that were dismissed.  It was both the aiding and

20   abetting, the securities fraud.  It was --

21            THE COURT:  Well, listen, how is that relevant?  That

22   case was before me.  I prepped for it and like this one, it was

23   adjourned and I think they went to mediation, right, no?

24            MS. DEGROOTE:  My understanding --

25            THE COURT:  Cipolla.

1          MS. DEGROOTE:  Yes.  With Cipolla, the trust and Mr.

2    Cipolla's counsel they have been speaking privately trying to

3    get his resolved.  My understanding is that Mr. Cipolla has

4    tried to be helpful to the trust without saying anything more

5    than that and that's what lead to the dismissal.

6          THE COURT:  Of certain counts.

7          MS. DEGROOTE:  Of certain counts.

8          MR. FLAHERTY:  Of the same counts of which he is

9    facing -- Understood.

10          THE COURT:  You're getting me all confused here

11   because that's a different case.

12          MR. FLAHERTY:  Understood, Judge --

13          THE COURT:  It's a different case.  I know that

14   there's an accountant.  I know the accountant got money and the

15   estate wants it back.

16          MR. FLAHERTY:  Happy to answer any questions you may

17   have, Judge, about where we stand.

18          THE COURT:  No, I'll give you a chance on reply.

19          MR. FLAHERTY:  Thank you.

20          THE COURT:  Let me just, hold on one second.  Can I,

21   I should have asked you before but you've selected former Judge

22   Falk as a mediator here.  Why do you want to do this on a

23   parallel track or we're here I guess.  You want a decision on

24   your motion.

25          MS. DEGROOTE:  Yes, Your Honor.  We had discussed

1    whether it made more sense to mediate before or after the

2    motion to dismiss and it appears that the parties are likely

3    too far apart in their numbers for right now for it to make

4    sense to try to mediate before a motion to dismiss.

5         THE COURT:  All right.  No, because when I was

6    looking at this last week, I said to myself well, they're in

7    mediation before Mark Falk.

8         MR. FLAHERTY:  It took us awhile to get Judge Falk

9    lined up, Your Honor, and I think, you know if we had him lined

10   up sometime ago before we went through the entire briefing

11   cycle we may be taking a different position than burdening the

12   Court with the pending motion.

13        THE COURT:  All right.  Let's hear from plaintiff's

14   counsel.

15        MS. DEGROOTE:  Good afternoon, Judge Sherwood.  Thank

16   you for your time today and thank you for the prior

17   adjournment.  That was because I was in the path of Hurricane

18   Milton so that's why it was so --

19        THE COURT:  Was that you?

20        MS. DEGROOTE:  That was me.

21        THE COURT:  Okay.

22        MS. DEGROOTE:  We made it out okay, but I really

23   appreciate that last minute adjournment when the hurricane

24   strengthened greatly overnight.

25        THE COURT:  Sounds like we made the right decision.

1    Yes.  Yes, you did, definitely, thank you.

2              MS. DEGROOTE:  With respect to the claims against

3    WIPFLI, the claims against WIPFLI just related to something I

4    know you know a lot about.  They had been the accountant for US

5    Construction and they did a lot of work with NRIA through US

6    Construction.  They also had engagements directly with some of

7    the NRIA entities including preparing the K-1's for the NRIA

8    investors.  So they were involved in what went on in many

9    different ways not just one way and their relationship had

10   begun nearly at the start of NRIA's business as opposed to

11   someone like Mr. Cipolla who came in much later.

12             The concerns that we have about WIPFLI are similar to

13   some of the concerns about US Construction and their

14   involvement including that WIPFLI was the accountant for

15   example for the 2031 Lombard LLC entity which was the entity

16   that USC had been using to pool all of the money and then

17   distribute out to the actual property level LLC's.  WIPFLI was

18   then doing the investor K-1's for the investors into those

19   LLC's and perhaps the most important allegation that we have is

20   that when NRIA switched up the game on the fraud and had the

21   fund, and so tried to convince all the investors in the

22   property level LLC's to roll over their investments into the

23   fund, it was WIPFLI that actually took care of doing that.

24   They did the accounting.  They were moving the investor

25   accounts.

1          And I think it's really important to understand

2   exactly what our allegations are about their role because it is

3   important to each of the claims.  But I'll take it in the order

4   that Mr. Flaherty took it and I'll start with in pari delicto.

5   In pari delicto needs to be addressed separately as to the

6   investors and as to the debtors.  I know that WIPFLI has wanted

7   to take it together and point to these cases that say that the

8   bankruptcy trustee for the debtor is not cleansed of the fraud

9   because it's representing claims that will eventually be paid

10  out to the investors.

11          We understand that.  We have a different situation

12  here.  Under the plan, the investors and NRIA actually

13  contributed their claims directly that they could otherwise

14  bring to the trustee.  So when the trustee comes and asserts

15  the claims on behalf of the investors, we're not similar to Mr.

16  Picard representing Madoff where Mr. Picard is just

17  representing the debtors.  We're representing the debtors and

18  we have claims that the investors could otherwise bring outside

19  of this case contributed to us.  And that's why the two issues

20  need to be addressed separately and that's why looking at the

21  cases like Kelley and looking at Picard, those don't resolve

22  the case here.

23          In Kelley the investors' claims had not been

24  contributed.  In Picard, the investors' claims had not been

25  contributed and in Picard, that the Civic (phonetic) trustee

1    had actually tried to argue that he could bring the customer

2    claims.  This is the case from the Second Circuit.  This was in

3    Mr. Flaherty's reply but not in the original brief so we didn't

4    address it.  But this is where the bankruptcy trustee had tried

5    to get around in pari delicto by saying that the Civic trustee

6    could bring the customer claims.  The Court didn't say no, no,

7    no, those customer claims are barred by in pari delicto.  What

8    the Court said is that Mr. Bell, you don't have standing or Mr.

9    Picard you don't have standing to bring those claims on behalf

10   of the customers.  Similarly --

11           THE COURT:  Is there any precedent that that's a good

12   work around to the problem?  I mean I've seen these litigation

13   trusts a lot and they do tend to try to solve problems by

14   having the creditors put in their individual claims as well as

15   estate claims.  That's a way to get by 546(b), the safe harbors

16   for avoidance actions and stuff like that.  Is there any

17   precedent for it working on an in pari delicto defense?

18           MS. DEGROOTE:  I haven't seen any decisions either

19   way.  I know you don't like to be the one to have to go into

20   unchartered waters, or none of us do, but I haven't seen any

21   decisions either way.  The decisions that I've seen are all

22   about bankruptcy trustees trying to argue that by virtue of

23   representing the debtor or the receiver they also represent the

24   investors' interest but I haven't seen any claims where it's

25   decided where they actually had the investors' direct claims

1    contributed into the trust and then were representing the trust

2    including the investors with their contributed claims.  I have

3    not seen that.

4              THE COURT:  And I think, correct me if I'm wrong, but

5    didn't Mr. Flaherty argue that you can't contribute tort claims

6    to a litigation trust?  Was that this case or was it another

7    case?

8              MS. DEGROOTE:  I have not seen any argument in the

9    papers that --

10             THE COURT:  Did you argue that?

11             MR. FLAHERTY:  That was Cipolla, Your Honor, that

12   made that argument.

13             THE COURT:  Oh.

14             MR. FLAHERTY:  Which I'm happy to join that argument

15   at this point in time.

16             MS. DEGROOTE:  So we'll leave that to you to resolve

17   for another day.

18             THE COURT:  All right, I'm sorry.

19             MS. DEGROOTE:  But there has been no objection to

20   that in this particular case and what, at the end of the day,

21   what _Laugherty_ says and what the _Wagner_ rules say, you know in

22   _Laugherty_ it was a creditors committee appointed by the

23   bankruptcy trustee that brought the claims but the claims were

24   this is a quote from page 344, "on behalf of the two debtor

25   corporations".  That's just not the situation here when we're

1    talking about the investors.

2            And in _Picard_ which turned on the _Wagner_ rule, that

3    rule says that a claim accrues to the creditors, to the

4    creditors not to the guilty corporation.  So when we're talking

5    about the investors, I think the law is pretty clear that

6    there's not an in pari delicto problem.

7            When we're talking about the debtors it's a different

8    situation.  When we're talking about the debtors, that's when

9    we get into this issue about there's an exception to the in

10   pari delicto defense for when you have new management come in

11   before the bankruptcy and I hear what Mr. Flaherty is saying

12   about the Casey Group allegations not being in the complaint.

13   We understand, they're not in the complaint.

14           The problem that WIPFLI still has is this.  In order

15   to dismiss a complaint on an affirmative defense, the

16   affirmative defense has to be apparent from the face of the

17   complaint.  We all know there's these issues out here about an

18   exception to the affirmative defense for when there's a change

19   in management.  It is very difficult for the trustee to come in

20   and plead around every affirmative defense.

21           When we look at the face of the complaint, an

22   affirmative defense of in pari delicto cannot be determined

23   with the debtors because there are these exceptions that we all

24   know very well may apply and it's not clear from the face of

25   the complaint that that's an acceptable ground to dismiss.

1          THE COURT:  So you shouldn't have to plead, you're

2    saying you shouldn't have to plead around an affirmative

3    defense before you see it.

4          MS. DEGROOTE:  Right.

5          THE COURT:  And haven't them raised any yet because

6    all they did was file a motion to dismiss.

7          MS. DEGROOTE:  Right.  And so there, and at this

8    point, and in a way they've raised it right, but there are all

9    sorts of affirmative defenses that could be raised right.

10   Maybe they would come up and say they have a good faith for

11   value defense or something like that right.

12         THE COURT:  The whole change in management thing I'm

13   not sure, I think the cases say what they say but why would it

14   change in management so shortly before the bankruptcy petition

15   be such a monumental event, right?

16         MS. DEGROOTE:  Well, and --

17         THE COURT:  The Casey Group came in because of the

18   misdeeds of the prior management so does that sort of take in

19   pari delicto off the table every time that's done or do I have

20   to find something else?

21         MS. DEGROOTE:  I don't think the law is particularly

22   clear on that.  I think the Casey Group came in long enough to

23   make some material changes --

24                        (Judge coughing)

25         MS. DEGROOTE:  No worries, Judge.  You need some

1    water?

2               THE COURT:  I got some.

3               MS. DEGROOTE:  Okay, good.  The Casey Group had come

4    in long enough to make some material changes that I think is

5    why the exception to this defense exists which is that Mr.

6    Casey was trying to right the ship, right?  So he comes in and

7    he's still trying to sell interests in the fund.  He's still

8    trying to bring in money but he's also trying to set right what

9    NRIA had been doing.  And to that end, for example he started

10    trying to pay off some mortgages.  He made decisions about what

11    to do with the NRIA money that changed the landscape of what

12    the financial situation looked like at that time.

13               So now some, you know, known wrong doers were paid

14    off.  Some money was moved around.  Some additional investor

15    money was raised from investors who presumably were not

16    defrauded.  They were legitimately brought in by Mr. Casey and

17    it just makes the pot of money a little bit different.  Instead

18    of having all this tainted money and everything that got paid

19    out was tainted money, you have a more confusing mix to sort

20    through and that some of the investors came in legitimately and

21    some money had gone out from someone who was trying to set

22    things right but maybe took the wrong priorities and what he

23    decided to pay like why did he pay down a mortgage instead of

24    paying off investors, right, or keeping that money from

25    investors.  So I think that's why the exception exists.  It

1   makes it harder to say that the company was all bad and any

2   claim that it would have it's an equal wrong with those it's

3   pursuing.

4        So with respect to the debtors, we think that defense

5   is what would enable the trustee to go forward even on the

6   claims for the debtors.  Now, with respect to the agent issue,

7   from WIPFLI's reply and from the argument today, I think the

8   issue on the agent arguments is that we're talking past each

9   other.  With respect to the issue of WIPFLI being an agent,

10  under the New Jersey statute and I know you've been looking at

11  this recently, Judge Sherwood, because you had your Media

12  Effective decision about this, what it says is that an agent is

13  an individual representing an issue of securities in that

14  effectuation of purchases or sales of securities.

15       And what I heard Mr. Flaherty say is that we don't

16  allege what misrepresentations were made as an agent.  But

17  that's not what we're necessarily getting at here, right.  This

18  is an aiding and abetting securities fraud claim.  They're

19  aiding and abetting NRIA and what they did was they effectuated

20  the sale of securities when they are taking the investor money

21  from the property level LLCs and they're rolling it over into

22  the fund.  The fund being the ultimate Ponzi scheme.

23       Okay, so very literally they are effectuating the

24  sale.  And that is in our opposition brief --

25       THE COURT:  But doesn't the law say that that doesn't

1    apply to lawyers and accountants as a general matter?

2          MS. DEGROOTE:  No, the law is not that it doesn't

3    apply to lawyers and accountants wholesale, it's that the

4    lawyers and accountants need to have basically done something a

5    little bit more than just their job, right.  So if WIPFLI had

6    just issued financial statements for NRIA and they hadn't done

7    anything more than that, it would be pretty difficult to sue

8    them under this.  But because they were actually the ones

9    taking the money and moving them between the two accounts to

10    effectuate the sale of the rollover from the LLC property level

11    entity into the fund, that's a different situation.

12          The other thing that the New Jersey cases turn on

13    when they're looking at whether an attorney or an accountant

14    can be liable is the level of direct interaction that they had

15    with the investor.  And so here in addition to rolling the

16    investors from the property level LLCs into the fund, we have

17    WIPFLI being the entity to issue the K-1s to the investors

18    basically telling the investors yes, your money is here for tax

19    purposes, right.  And then the individual investors are getting

20    that.

21          So they think there's genuinely money to roll from

22    these property level LLCs into the fund.  It turns out that

23    money is not there, right.  It's all going through the 2031

24    account and getting moved around which is also an account that

25    WIPFLI was looking at.  So this situation is not the standard

1   accounting or attorney situation where we see the New Jersey

2   court saying no, that doesn't count as being an agent.  And

3   these allegations are in the complaint --

4             THE COURT:  Well, what exactly did they do to effect

5   the sale of the security under New Jersey law?

6             MS. DEGROOTE:  So they haven't --

7             THE COURT:  They rolled up the project level

8   investments up to the fund?

9             MS. DEGROOTE:  Yes, they were the one --

10            THE COURT:  How did they do that?  Did they actually

11   solicit the roll from one entity to the other, do you know?

12            MS. DEGROOTE:  I don't know --

13            THE COURT:  Well, how can you allege it if you don't

14   know.

15            MS. DEGROOTE:  Sorry --

16            THE COURT:  You must know something.

17            MS. DEGROOTE:  You said did the solicit the roll?

18            THE COURT:  Yes, did they encourage or, an investor

19   in a project level entity to roll that investment into the

20   fund?

21            MS. DEGROOTE:  Okay, I understand what you're saying

22   now.

23            THE COURT:  Yes.

24            MS. DEGROOTE:  They did two things.  First of all,

25   they're issuing the K-1s to the investors in the property level

1     LLCs which tell them you have an interest in this LLC as in

2     your money is there.

3               THE COURT:  Okay.

4               MS. DEGROOTE:  And then when NRIA is convincing

5     people to roll from the LLC into the fund, I don't believe that

6     WIPFLI directly told the investors, yes, you should roll your

7     money but they are the ones who are moving the money between

8     the accounts.  They're accountants.  They're doing the

9     accounting.  We have an email from them with USC with NRIA

10    where they say you know yes, we'll move the accounts over.  So

11    they are the ones who are literally carrying out the move.

12              THE COURT:  So WIPFLI had the right and the authority

13    to move money from one debtor account to the fund, to the

14    fund's account?

15              MS. DEGROOTE:  Based on the email that I've seen, it

16    looks like they had some responsibility for the accounts and I

17    can try and look at the email directly if that's helpful.  In

18    terms of literally moving the money, I don't think they're

19    transferring the money from like one Bank of America to another

20    account and also the money didn't actually, the money turned

21    out to not actually being there, right.  So they're doing the

22    accounting for it.  Whether it was actually there in principle

23    to even be moved I think is an uncertain question.  It might

24    depend on the particular account.  But our allegation which is

25    in paragraph 68 is that they were assisting with the rolling by

1    providing the accounting advice specifically related to the

2    fund.  They were the ones who maintained reports tracking all

3    of the redemptions and the rollovers.  And that there's a

4    January 3rd, 2020 email where Dustin Salzano explains exactly

5    how WIPFLI was recording the rollovers from the investors into

6    the fund by "moving the original customer's capital account to

7    NRIA as of the rollover date."

8              So what exactly they meant by that and what exactly

9    that entailed is something we would certainly ask about in a

10   deposition.  But at this point, I have their emails to go on

11   and my understanding is that they were literally responsible

12   for the investments into the fund by moving the capital account

13   to NRIA as of the rollover date.

14             And in terms of the New Jersey cases, I just would

15   say this contrast with the Zendel (phonetic) case, right, which

16   is the, that key case from New Jersey where the Court found it

17   important that the law firm there hadn't actually had any

18   contact with the plaintiffs.  That same distinction isn't

19   present here.  We allege in paragraphs 42, 55, 97 and 105 about

20   the contact that WIPFLI had had with the investors here,

21   particularly with the K-1's.

22             THE COURT:  All right.  I think on whether this

23   defendant is an agent is ultimately a question of fact.  I did

24   find that the advertising agency was not an agent after a full

25   hearing and testimony.  So I don't think it's a motion to

1   dismiss issue but I do think that the plaintiff has a bit of an

2   uphill battle on that one but I'm keeping an open mind --

3            MS. DEGROOTE:  Okay.

4            THE COURT:  -- because I would like to know what the

5   facts are.  And I also know that you guys appealed that part of

6   my decision, is that right?

7            MS. DEGROOTE:  Yes, that is on appeal now.

8            THE COURT:  Okay.  All right, what about malpractice?

9            MS. DEGROOTE:  And Judge Sherwood, just to be clear,

10  this, our argument here is not contingent on the argument on

11  appeal.  I think we have a separate situation because in that

12  case they were trying to, they were advertising the securities

13  right.  We're not talking about advertising securities.  We're

14  talking about literally the entity that's moving the capital

15  account of the investor to NRIA to effectuate the sale in the

16  fund.  So yes, we did take that up on appeal.  The reason I

17  didn't bring that up not just to avoid hard feelings, but

18  because I don't think it's important to this particular case.

19           THE COURT:  There's no hard feeling, believe me.

20  That wasn't an easy decision so.

21           MS. DEGROOTE:  With respect to the accounting

22  malpractice case, that is also a very fact intensive inquiry.

23  I think even more than the agency inquiry because you have to

24  analyze whether or not there's a duty under New Jersey law and

25  I believe WIPFLI even said in their reply brief this is a

1    particularly fact intensive inquiry.  We agree with that.  We

2    think that we've plead enough to get to the discovery stage on

3    that case but it is fact intensive and what WIPFLI seems to

4    base its arguments on in its briefing is that there wasn't an

5    engagement letter with NRIA the parent company and WIPFLI.

6    There's a lot of stock put into that.

7            But the analysis of what constitutes a duty and the

8    factors that a court looks at does not turn on whether or not

9    the agreement was boiled down into writing and the allegations

10   that we have in the complaint specifically in paragraph 73 and

11   75 is that WIPFLI was billing the NRIA LLC entities directly

12   for work but some of that work was actually for engagement

13   letters that they had with USC.

14           So it's a very mixed pot here.  And we also have an

15   allegation that when there was an issue where WIPFLI needed to

16   issue a refund to NRIA, it went to the NRIA parent company not

17   to the LCC that it had been doing work for.  So even WIPFLI

18   sort of disregarded the separate corporations with respect to

19   the property level LLCs and NRIA as the parent company.  But I

20   think the most important thing to think about is the allegation

21   in paragraph 73 which is that it may have been doing work at

22   the direction of USC, but it was not USC getting invoiced for

23   the work.  It was ultimately NRIA paying for the work so I

24   don't think it's persuasive to look at the engagement letters

25   when we know that the engagement, who's being engaged, what's

1   being done and who's paying and who's getting a refund is all

2   jumbled together.

3           With respect to the --

4           THE COURT:  Well, what's your understanding of how it

5   worked?  If there was an engagement with USC, why was WIPFLI,

6   why were they performing services for National Realty and why

7   were they paid by National Realty?  Do you know enough to make

8   any allegations here?  I mean I don't know whether there is an

9   engagement between --

10          MS. DEGROOTE:  Sure.

11          THE COURT:  -- the debtors and WIPFLI.  So how can

12  there be malpractice --

13          MS. DEGROOTE:  There's certainly -- okay.

14          THE COURT:  Where's the duty, I guess?

15          MS. DEGROOTE:  Right.  There definitely were

16  engagement letters between WIPFLI and, is it WIPFLI or WIPFLY?

17          MR. FLAHERTY:  WIPFLI.

18          MS. DEGROOTE:  WIPFLI, okay, sorry.  I wanted to

19  insure I was saying it right.

20          THE COURT:  I've been calling it WIPFLY since I've

21  seen it.

22          MS. DEGROOTE:  It's so hard.  You call it something

23  in your head --

24          THE COURT:  I'm sorry.

25          MS. DEGROOTE:  -- and then you have a moment like

1   this and you think you might have reckoning.  So with respect

2   to WIPFLI in particular, there were engagement letters with

3   some of the NRIA property level LLCs.  There were direct

4   engagement letters.  In terms of the general accounting work

5   that WIPFLI provided, it was engagements with US Construction.

6   With respect to why that happened in this particular case, I

7   don't know but this is an issue we've been running into with

8   the trust inheriting the privilege with attorneys.

9          Attorneys who performed work for NRIA and were paid

10  by NRIA, when we go to ask for our files, we're being told,

11  well, no actually I was engaged by USC.  And the explanation

12  from USC is that it's common for a developer to sort of go out

13  and make the relationship with the attorney or make the

14  relationship with the accountant and then they're actually

15  performing work for the property level LLC that the developer

16  is representing.

17         So according to what we learned in the US

18  Construction depositions this isn't anything atypical but it

19  leads to an odd situation when you go to assert the attorney

20  client privilege or you start looking at who's the client for

21  purposes of a, you know accounting malpractice claim.  But the

22  alcohol of a duty under New Jersey law is not solely read to

23  whether or not there was an engagement letter.  It's a much

24  more fact intensive inquiry that looks at what the relationship

25  actually looked like.

1          So we think we have enough elements there especially

2    because WIPFLI knew that it was preparing investor K-1s in

3    connection with those property level PPM's and it's evident

4    from issuing the K-2 that they would have to look at some

5    information to prepare the K-1.  In addition, we have the

6    allegations between that there were direct interactions between

7    NRIA and WIPFLI, right.  Like we've seen the email that they

8    have about how they're going to handle rolling people from the

9    property level LLC's into the fund.  That's an email with US

10   Construction but it's also an email with the folks running

11   NRIA.

12         So the allegations are much broader than just what

13   they did for the individual property level LLC's and it would

14   be an odd situation if you could avoid having a duty by getting

15   a company that at the time was being run fraudulently to not

16   enter into an engagement letter that would, you know ultimately

17   protect someone after a bankruptcy.  So I don't think it's as

18   technical as whether or not there's an engagement letter.

19         And with respect to the two different types of

20   claims, the debtors and the investors, both the debtors have

21   this direct interaction with WIPFLI through the engagements and

22   through their general seeking of accounting advice including

23   advice about whether to deviate from GAP which we allege

24   extensively in the complaint and then the investors have this

25   interaction directly with WIPFLI because they're receiving the

1    K-1s prepared by WIPFLI with respect to the property level

2    LLCs.

3            THE COURT:  Why didn't you allege actual fraud under

4    548 and New Jersey State law, like a fraudulent conveyance?  Is

5    that part of your complaint?  You said aiding and abetting

6    fraud?

7            MS. DEGROOTE:  This par complaint does not have, does

8    not have a fraudulent conveyance claim or a general type of

9    call back claim, right, which is what you're thinking of for

10   the fees that NRIA had paid.

11           THE COURT:  Right.  How much did NRIA pay WIPFLI, do

12   you know?

13           MS. DEGROOTE:  I don't know that off the top of my

14   head.  I can find that out for you, Judge Sherwood.  I think

15   that, I don't want to speak out of term.

16           THE COURT:  Well, count one is aiding and abetting

17   fraud.

18           MS. DEGROOTE:  That's right.

19           THE COURT:  So that's like common law fraud.

20           MS. DEGROOTE:  That's right, yes.  And there's an

21   aiding and abetting securities fraud under the securities fraud

22   statute.  Perhaps the fraudulent conveyance part of the, part

23   of it was the time restriction but I don't know off the top of

24   my head, I should say I don't remember off the top of my head.

25           THE COURT:  Did you cite to some law that said that

1    in pari delicto is a factual issue?  What case said that?  I

2    have that in my notes but I can't find it in your brief.

3              MS. DEGROOTE:  Let me pull up the brief.  I think

4    that it's implicitly a factual issue because when you look at

5    the cases that have resolved in pari delicto, it's more on a

6    summary judgment motion than a motion to dismiss.  The one

7    notable exception to that would be the Picard case, the Madoff

8    case where it was so clear that the, it was Madoff who,

9    Madoff's firm that was being represented.  There was no change

10   in management, nothing had happened before it went into

11   bankruptcy and they didn't represent the customers.  They

12   didn't have standing to represent the customers so that was a

13   motion to dismiss.  But aside from that, I think the in pari

14   delicto cases implicitly say it's a fact issue because these

15   aren't cases that are regularly getting resolved on a motion to

16   dismiss with the notable Picard exception.

17             And Judge Sherwood, the cite for the case where we

18   said courts have often recognized that findings related to in

19   pari delicto particularly when considering one of the

20   exceptions are fact issues for a jury, that case is Sevenson

21   Environmental Services versus McDonald, that's from this

22   District from September of 2015 and the Westlaw cite is 2015WL

23   --

24             THE COURT:  What page of the brief is that in?

25             MS. DEGROOTE:  This is on page --

1          THE COURT:  <u>Sevenson</u>, I'm looking at your table of

2     cases.

3          MS. DEGROOTE:  This is page 21 on document nine.

4          THE COURT:  <u>Sevenson versus McDonald</u>, DMJ, yes, I

5     thought I remembered reading that.

6          MS. DEGROOTE:  Yeah.

7          THE COURT:  Okay.

8          MS. DEGROOTE:  You have a good memory, Judge

9     Sherwood.  So yes, it is there.  It is 2015 Westlaw 13767999

10    and we have another cite too from the Third Circuit, <u>McAdam</u>

11    <u>versus Dean Witter Reynolds</u>.

12         THE COURT:  All right.

13         MS. DEGROOTE:  Judge Sherwood, with respect to the

14    aiding and abetting claims that we were just discussing, there

15    has been, in the reply brief there's a lot of, the claim is

16    that there's not enough in the aiding and abetting claims for

17    WIPFLI to answer the complaint and I don't think that's true.

18    When you look at the complaint and you look at the allegations

19    about what they did, and we have a paragraph in our opposition

20    brief that sets out all of the, not all of the allegations but

21    examples of the allegations supporting each of the elements of

22    aiding and abetting fraud and we cite things such as WIPFLI

23    reviewing the PPM's and the governing documents.

24         They asked to provide advice on the PPM's being

25    involved in preparing the 2031 Lombard tax returns which is the

1   entity that showed all the patterns of transferring money in

2   and out of the LLC's to make them look like they had money when

3   they didn't.  Giving advice on how to show that a company looks

4   profitable when it wasn't.  Rolling the investors over with

5   phantom profits that didn't actually exist.  All of this is

6   alleged in the complaint and there's enough to answer.  WIPFLI

7   just has to come back and tell us did they provide advice on

8   the PPM or not.  Did they prepare tax returns for 2031 Lombard

9   or not?  Did they notice that that was being used as a

10  clearinghouse in a pattern of fraud or not?  We could go on.

11          But the important part here is that there is enough

12  to answer on.  There is enough clarity to tell WIPFLI what it's

13  being accused of and there's enough to survive a motion to

14  dismiss.  Because of that, the end just enrichment claim which

15  is the last, the fourth claim, that should go forward as well.

16          THE COURT:  Okay.

17          MS. DEGROOTE:  If you have no further questions.

18          THE COURT:  I'll hear from Mr. Flaherty one more

19  time.

20          MS. DEGROOTE:  Thank you, Judge Sherwood.

21          THE COURT:  You're welcome.

22          MR. FLAHERTY:  Thank you, Judge.  A few things in

23  response.  You posed a question of how much has WIPFLI paid.

24  At paragraph 114 of the complaint, the unjust enrichment claim

25  there's a, they're seeking recovery of $318,000.  My suspicion

1    is that's what WIPFLI was paid.  I can't confirm that

2    independently but I was gleaning at least from the allegation

3    we see at paragraph 114.  I'll try and run through a few of

4    these issues that came up during the course of the argument,

5    Judge.

6             I want to start with something very fundamental.

7    WIPFLI never provided financial statements to NRIA.  WIPFLI was

8    never engaged by NRIA.  WIPFLI provided some accounting and

9    bookkeeping services to some NRIA entity LLC's.  There's a

10   comment made in the argument about, you know if WIPFLI only

11   provided financial statements to NRIA we wouldn't be having

12   this conversation.  Well, in fact they never provided financial

13   statements to NRIA or any NRIA related entity.

14            They did provide a financial statement to be clear to

15   US Construction with certain limitation.  It wasn't an audit.

16   It was a reviewed financial statement with certain exceptions

17   to GAP in that reviewed financial statement.  But that's not

18   what we're here talking about today.

19            THE COURT:  Well, if they, the problem I have

20   dismissing this case is and with WIPFLI, and I might be wrong,

21   but US Construction is a big defendant in this case, none of

22   the principals is Dustin Salzano as you know, as we all know.

23   And I don't know what the nature of his wrongdoing was if any.

24   He was a partner.  There was another gentleman who was a

25   principal of US Construction --

1          MR. FLAHERTY:  Farina (phonetic).

2          THE COURT:  Mr. Farina.  I don't know whether he was

3    involved in this case and what the nature of his involvement

4    was.  That's a separate adversary and that's in mediation.  I

5    mean if Farina and Dustin Salzano have some unclean hands, I

6    mean that might extend to WIPFLI in some respect.  I don't know

7    what WIPFLI knew, whether they were purely focused on US

8    Construction but how is it that they can work for US

9    Construction on one hand and then get paid on the other by, you

10   know one of the debtors?  And why is the accountant for a

11   construction company involved in this rolling up of investment

12   from one entity to the fund?

13         MR. FLAHERTY:  Yeah, I want to talk about that,

14   Judge, and you know just in full transparency, I agree with

15   something Ms. DeGroote said which is WIPFLI clearly provided

16   some accounting services, not audit services, not financial

17   statement services, to some of the NRIA entity level LLC's.  It

18   was bookkeeping.  It was K-1's as Ms. DeGroote said.  They were

19   in fact issuing K-1's, preparing K-1's I should say to get to

20   certain investors and certain of the NRIA LLC's.

21         I don't know what she's talking about, in the context

22   of rolling up investments into the fund.

23         THE COURT:  Well, are the LLC's, LLC's that were for

24   projects that US Construction worked on?  Was it just cabined

25   in the US Construction projects where they would work not only

1       for US Construction but also deal with their investors and the

2       monies they invested into that project?

3                MR. FLAHERTY:  I believe, Judge but I don't, I can't

4       say I know that the LLC's that WIPFLI providing services to

5       were project that US Construction was working on.  I believe

6       there is overlap there.  I want to talk about, I'm happy to

7       pause and answer just some questions to kind I'm able to on

8       that topic but as I heard you say with respect to the agency

9       claim that's a fact intensive exercise and I know what that

10      likely means with respect to the motion but I think it's

11      important to, at least respond to something.

12               There was an allegation that WIPFLI was moving money

13      between accounts.  I don't think that's true and I don't think

14      that allegation exists in the complaint either.  I'm not sure

15      and WIPFLI did not have fiduciary authority over bank accounts

16      and they're providing accounting services.  They are not a

17      banker.  They're not a fiduciary that has the authority to move

18      money from one account to another account.  They're preparing

19      reports that go to clients or client representatives for that

20      matter in the course of providing accounting services.

21               So I'm not sure where that whole line of back and

22      forth between you and Ms. DeGroote came from but I'm unaware of

23      any movement of money that WIPFLI had any involvement

24      whatsoever --

25               THE COURT:  Well, did they have any involvement in

1    changing the investment from the LLC level to the fund level?

2    Because we all know that happened, right?  There was a fund

3    created and individual investors got the opportunity to

4    transform their investment in the LLC to an investment of the

5    fund and in some cases, they got sort of a kicker on top.  I

6    think that has been alleged.  I haven't made a finding of fact

7    on that yet in the case.

8            MR. FLAHERTY:  I think they were undoubtedly were

9    involved in some accounting entries with respect to that

10    transition you're describing, Judge.

11            THE COURT:  Okay.

12            MR. FLAHERTY:  But again, accounting services are not

13    audit services.  They're not attesting to anything and I just

14    want to go back, bounce around here a little bit.  Well, let me

15    finish off if we could the whole agency argument.  The biggest

16    problem with the agency argument here is they're putting the

17    cart in front of the horse.  Investors making investment before

18    WIPFLI does anything, right.  You talk about K-1's.  K-1's only

19    get issued after an investment is made, not before.

20            So I'm still struggling to find the representation

21    that is an essential element of the New Jersey Securities Law

22    claim.  I don't think issuing a K-1 after an investment has

23    been made is inducing an investor to make an investment.  It's

24    after the fact.

25            THE COURT:  So far I'm with one hundred percent but I

1    think what Ms. DeGroote said was when the individual LLC

2    investment was rolled into the fund sometimes with a kicker,

3    that's a different security.  That's a trading of one security

4    for another.

5            MR. FLAHERTY:  I would still argue, Judge, what is

6    WIPFLI's representation?  What have, what statement have they

7    made that is inducing the investor to make a decision at that

8    point in time?  Is it the prior K-1 that --

9            THE COURT: But, you would agree that an interest in

10   one of the individual LLC's, right, that interest is very much

11   different than an interest in a fund that's a pool.

12           MR. FLAHERTY:  I agree with you on that, Your Honor.

13           THE COURT:  I mean that's a different security.  So

14   arguably it is a sale of a different security.  But I totally

15   agree with you as to the original LLC interest in the issuance

16   of a K-1.  I don't see that as agency, I'll keep an open mind

17   on exactly what happened with WIPFLI in the context of the

18   rolling transaction from the LLC to the fund.

19           MR. FLAHERTY:  Thank you, Your Honor, I appreciate --

20           THE COURT:  And I think that's a question of fact but

21   I'm not loving their case on that count.

22           MR. FLAHERTY:  With, you asked the question about you

23   know is in pari delicto inherently a fact base inquiry.  I've

24   read a lot of in pari delicto cases.  It gets decided at every

25   juncture in a proceeding.  It gets decided at the motion to

1     dismiss level.  It gets decided at summary judgment level.  It

2     gets decided post verdict motion level and it gets decided on

3     appeal.

4           I would direct the Court's attention specifically to

5     a very similar case.  We cited the In Re Mortgage Fund 08 LLC.

6     It's out of the Northern District of California from 2015.  It

7     was a case initiated by a liquidating trustee.  That was

8     decided at the motion to dismiss level and there are others

9     that are within the citation in our brief that were also

10     decided at the motion to dismiss level.  It's not exclusively

11     at the end of a discovery/summary judgment type exercise.

12           THE COURT:  Tell me, how do you feel about the

13     argument the investors versus the debtor?  The investors, under

14     the plan that I confirmed, right, the plan says that all the

15     investors in exchange for release, I think it's an exchange of

16     for release of their individual claims, whatever they might be,

17     contribute their claims into the trust and the trust can pursue

18     both the investors' claims and the estate's claims and they'll

19     just put the investor label on this one and therefore why

20     should in pari delicto prevent them from bringing, it's kind of

21     unfair, don't you think, to have in pari delicto apply to the

22     investors who weren't involved in the actual fraud themselves?

23     Go ahead.

24           MR. FLAHERTY:  No.  So Judge, this is in the category

25     again of you'll hear it when I get to the malpractice claim.

1   The trustee wants to have its cake and eat it too.  Just

2   because they have inherited certain rights to pursue claims a

3   part of the investor, doesn't change that they're fundamentally

4   stepping in the shoes of a debtor and when they step in the

5   shoes of a debtor, that comes with certain limitations.  And I

6   again direct the Court's attention to Kelley versus BMO Harris,

7   the same issue was there and I think the same issue was in

8   Madoff as Ms. DeGroote mentioned.  You can't immunize yourself

9   from a defense by taking up the baton from some other party and

10  running with it in the race.

11          THE COURT:  I know it's done a lot though.  That's

12  why I asked Ms. DeGroote whether a court has actually upheld

13  that.

14          MR. FLAHERTY:  Yeah, and you see most typically in

15  pari delicto will not be effective against an investor acting

16  on the investor's own behalf.  I think that's the Cella

17  (phonetic) case, v. Dean Witter --

18          THE COURT:  I'm sorry say that again.

19          MR. FLAHERTY:  If it's an innocent investor acting on

20  his or her own behalf, in pari delicto was typically not held

21  against them.

22          THE COURT:  Okay.

23          MR. FLAHERTY:  However, when that investor claim

24  moves in the hands of a trustee and the trustee is pursuing

25  that claim on behalf of the investor or creditor as the case

1  may be, in pari delicto is consistently applied to the debtor

2  because the trustee steps in the shoes of the debtor.

3        THE COURT:  In what, what case says that?

4

5        MR. FLAHERTY:  Oh, it's I think it's not far off the

6  point, the Kelley case.  I think the trustee there had the

7  right to pursue claims on behalf of creditors in Kelley v. BMO

8  Harris.

9        THE COURT:  Anybody have a copy of that case?

10        MS. DEGROOTE:  Yes, Your Honor.

11        MR. FLAHERTY:  I do.

12        MS. DEGROOTE:  I have a copy of it.  It's more nuance

13  than that.

14        THE COURT:  Kelley versus --

15        MS. DEGROOTE:  What happened in that case is that

16  under, I think it was Minnesota law, he was, Mr. Kelley was

17  briefly the receiver before he became the bankruptcy trustee

18  and under Minnesota law while he was the receiver, he could

19  have brought claims on behalf of investors in State court while

20  he was the receiver and then once he became the bankruptcy

21  trustee, the Court said well, maybe you could have done that

22  when you were the receiver under Minnesota law in Minnesota

23  state court, but now you're the federal bankruptcy trustee and

24  now you can't do that.  But he did not have the claims of

25  investors contributed in the same way that we have here.  He

1    just had this like, this nuance operation of Minnesota law

2    where he was allowed as the receiver before he became the

3    trustee to bring their claims.  It's not the same as this case

4    where the investors have actually contributed their claims to

5    this liquidation trust that we are now pursuing.

6            THE COURT:  All right, so hold on.  As a receiver

7    under Minnesota law, he, he did have the right to pursue

8    investor claims.

9            MS. DEGROOTE:  For like a brief window.  So first

10   this is the Petters bankruptcy, right.  So it had briefly gone

11   into receivership before it went into bankruptcy and while he

12   was the receiver under Minnesota law, he could have brought the

13   claims.  But the federal court said okay, well, you could have

14   done that under Minnesota law, whatever.  Now, you just are

15   representing the debtors as a federal bankruptcy trustee.  You

16   can't do that now.  You're not a receiver anymore.

17           THE COURT:  So there wasn't a plan in this case where

18   the investors contributed their claims to the litigation trust?

19           MS. DEGROOTE:  No, that wasn't his argument.

20           THE COURT:  In the Kelley case.

21           MS. DEGROOTE:  His argument was based on this like

22   nuance of Minnesota law about how he could have done it as a

23   receiver and the Court said okay, that didn't, that's where the

24   cleansing language comes from.  The Court says the fact that

25   you were briefly a receiver and could have brought the

1    investors' claims didn't cleanse the bankruptcy estate now that

2    you're a bankruptcy trustee.  So it was a different argument

3    from the one that we have here.

4              THE COURT:  All right, so I don't think Kelley is

5    directly on point.

6              MR. FLAHERTY:  I'm happy --

7              THE COURT:  Because listen, the whole thing about

8    this case is the investors contributed their claims to the

9    litigation trust, their individual claims.  And am I right,

10   didn't they release their individual claims or they contributed

11   them and they released, they agreed not to pursue them.

12             MS. DEGROOTE:  Right, so they can't all like turn

13   around and sue WIPFLI, right.  WIPFLI is not going to have like

14   a hundred cases from you know a hundred different investors or

15   five hundred different investors because they've contributed

16   the claims to the trust.

17             THE COURT:  Right.

18             MS. DEGROOTE:  And the trust will bring them which is

19   much more efficient.

20             MR. FLAHERTY:  And I think our argument, Judge, is

21   that the trustee cannot gain an inherited advantage by taking

22   on investor claim that would otherwise limit the authority to

23   act in an in pari delicto setting.  I'm happy to provide some

24   supplemental authority.  I believe there are cases out there

25   that would --

1          THE COURT:  See, I --

2          MR. FLAHERTY:  -- more closely mirror what we're

3    dealing with here.

4          THE COURT:  Yes, years ago I was involved in a lot

5    of, some big litigation concerning the 546(e) Safe Harbor

6    defense which applied to estate claims against, so and I forget

7    the name of the case but they called it the 546 work around

8    case and basically they worked around this slam dunk defense

9    that preferenced in a fraudulent conveyance defendants had by

10   asserting the claims of the individual creditors that were

11   contributed to the trust, just like here.

12         MS. DEGROOTE:  Is that the Tribune (phonetic) case?

13         THE COURT:  Tribune, yes.  Thank you.

14         MS. DEGROOTE:  Yeah, that went to the Supreme Court.

15         THE COURT:  Yes.  Did the Supreme Court strike it

16   down?

17         MS. DEGROOTE:  I knew that was going to be your next

18   question.

19         THE COURT:  You shouldn't brought it up then.

20         MS. DEGROOTE:  I can't remember off the top of my

21   head.  But yeah, that was In Re Tribune.  That was a massive

22   litigation for a long time.

23         THE COURT:  So that's why I asked Ms. DeGroote and I

24   ask you did these work around, has any court in the Third

25   Circuit spoken to whether these work arounds are effective or

1    not.  Because I hear what you're saying.  I hear what you're

2    saying.

3              MR. FLAHERTY:  I don't believe the Third Circuit has

4    spoken any louder than <u>Laugherty</u> in this regard, Your Honor,

5    that I've seen.  Last point, dovetails a little bit with what

6    we were just talking about on the agency issue is back to the

7    accounting malpractice, there are different elements for an

8    accounting malpractice vis-a-vis the debtor or debtors as

9    opposed to the investors and we lay that out in our reply

10   brief.  They're different elements as, client relationship

11   versus a third party relationship.  And we do not think the

12   complaint as currently plead meets the standards, certainly for

13   the investor claims.  It looks like that's kind of where

14   they're hanging their hat because that's where the, presumably

15   the money is.

16             But they have to show that WIPFLI knew, you know

17   which investor was asserting a claim, specifically identify to

18   WIPFLI that WIPFLI knew each specific transaction that was

19   being impacted by its advice for those investors and finally

20   that we directly expressed to each investor that we understood

21   the investor was relying on our advice.  Again, this is not an

22   audit case.  This is not a case of assurance.  This is a case

23   of bookkeeping records that are in the format of P&L's for

24   individual LLC's and a K-1 being issued on an annual basis.

25             I'm not sure where the statement is that is going to

1   yield the accounting malpractice on the part of the investors

2   and at a minimum, Judge, we need to have greater specificity as

3   to what the allegations are.  Ms. DeGroote mentioned a couple

4   of paragraphs in it, in the context of the fraud claim.  And to

5   be clear, there was a heightened pleading standard with a fraud

6   claim with particularity and we are still having a heck of a

7   time determining the who, what, where and when's which it will

8   requires them to articulate to us at the complaint stage as it

9   relates to the fraud claims.

10          And for all those reasons, Your Honor, primarily

11  relying on in pari delicto we think the claims should be

12  dismissed, or at a minimum the plaintiffs should be required to

13  file an amended complaint remedying the issues that we've

14  identified with the current complaint.

15          THE COURT:  I mean do you agree that because they are

16  a litigation trustee as opposed to current management I have to

17  give them some sort of deference at the pleading stage?  I

18  think I do.

19          MR. FLAHERTY:  Yeah, and in the typical case where

20  they come in, and have had no benefit of discovery, Judge, I

21  would agree with you.  I have been working with one of Ms.

22  DeGroote's partners for about a year and a half and WIPFLI, you

23  know got a 2004 demand.  We issued lots and lots of documents

24  to them.  I believe it was a year and a half ago.  So this is

25  not the case typical where a trustee is coming in and doesn't

1   know the lay of the land.  They are well aware of the lay of

2   the land and we think that deference that might otherwise be

3   afforded should not be afforded here where there have been

4   extensive discovery that they've had the benefit of and frankly

5   we have not had the benefit of.

6           THE COURT:  Have they provided any discovery to you?

7           MR. FLAHERTY:  No.  To be fair, we did not propound

8   any discovery request on them given our pending motion to

9   dismiss.

10          THE COURT:  And I think the answer on the malpractice

11  claim is they want flexibility.  They want either or at this

12  stage of the game.  It is just a notice pleading statute.  They

13  don't have to plead malpractice.  They just have to put you on

14  notice of what the claims are.

15          MR. FLAHERTY:  You're right, Judge, but the reason I

16  think it's inherently unfair is they are asserting claims on

17  both, on behalf of the debtors and the investors and they are

18  different standards.  And they have woefully not met the

19  investor pleading requirement to give us specific notice of

20  what statements to what investors that they, the investors

21  claimed to have been relying on.  So it's not the same test for

22  both and to that end, we think we deserve more specificity as

23  it relates to those accounting malpractice claims.

24          THE COURT:  All right.

25          MR. FLAHERTY:  Thank you, Your Honor.

1          MS. DEGROOTE:  Briefly, Your Honor.

2          THE COURT:  Briefly.

3          MS. DEGROOTE:  Just a couple of issues.  First of

4   all, Tribune got denied cert. from the Supreme Court.  So then

5   the Second Circuit decision was upheld.

6          THE COURT:  I thought Tribune was Third Circuit.  Was

7   it Second Circuit?

8          MS. DEGROOTE:  It was Second Circuit.  If it were,

9   yeah, it was the Second Circuit, according to McGuireWoods'

10  summary of it, it was a Second Circuit case.

11         THE COURT:  All right.  Okay.  Nobody cited, I was

12  just reminiscing about past cases.

13         MS. DEGROOTE:  No worries.  So the Second Circuit

14  case got left intact.  The Supreme Court didn't want to touch

15  it which is of course what happened every time the Madoff cases

16  go up to the Supreme Court too, right.  They never want to

17  touch this stuff which is unfortunate.  In terms of the New

18  Jersey Securities Law issue, I heard Mr. Flaherty argue today

19  that we don't allege enough about the misrepresentations for

20  the securities fraud.

21         In the opening brief that WIPFLI filed, their problem

22  with the New Jersey Securities claim is the agency argument.

23  We didn't get into in the briefing the misrepresentations and

24  whether or not those were sufficient because that argument

25  wasn't in the opening brief.  It was waived.  With respect to

1    the accounting argument and the accounting malpractice claims,

2    again I keep hearing Mr. Flaherty say we don't point to

3    specific misrepresentations.  This is why there's a confusion

4    in the brief about whether they're arguing that Rule 9(b)

5    applies to the accounting malpractice claim.

6         There's no reason we need to put out specific

7    misrepresentations in an accounting malpractice claim.  That's

8    not an element of accounting malpractice --

9         THE COURT:  What about, well count one is aiding and

10   abetting fraud, right?

11        MS. DEGROOTE:  That's right.  Count one is aiding and

12   abetting fraud.  Count two is aiding and abetting the

13   securities violations. Those are 9(b).

14        THE COURT:  Right.

15        MS. DEGROOTE:  But when you get to the third claim,

16   the accounting malpractice claim, we were confused by their

17   opening brief thinking they were arguing 9(b) applied because

18   he wants these particular statements and what was made to who

19   which is, you know a 9(b) issue but we said in our opposition

20   brief Rule 9(b) doesn't apply and in their reply they said we

21   agree Rule 9(b) doesn't apply.

22        So if we all agree Rule 9(b) doesn't apply to the

23   accounting malpractice claims, those are malpractice claims.

24   The elements are not fraud claims.  There's no reason we need

25   to point them to specific misrepresentations at this stage.  So

1    I just want to be clear about that because I thought from their

2    reply we were on the same page, that that's a Rule 9 issue.

3    That's a Rule 8 issue.

4         And the last thing I wanted to say, Judge, is with

5    respect to the in pari delicto issue and this argument that

6    it's not fair.  I think there's a serious systemic issue that

7    we should think about which is that it's much more efficient to

8    have the claims contributed rather than have Mr. Flaherty's

9    client subject to a bunch of lawsuits by a bunch of individual

10   investors or a separate class action claim from the debtors and

11   that the concern about fairness is not the concern that you see

12   int e case law.

13        For example, in Picard when they talk about the

14   customer claims and when they determined that the Civic trustee

15   didn't have standing to assert those claims, what they said in

16   Picard on page 67 and this is the Second Circuit, what they

17   said in the statutory scheme, there's no recognition that the

18   trustee has responsibility for suing on behalf of creditors.

19        And they say that this way the creditors can make

20   their own assessment of the respective advantages and

21   disadvantages not only of litigation but of various theories of

22   litigation.  How many damages to seek?  How much damages to

23   seek?  What theory to sue on?  Disputes over inconsistent

24   judgments and the scope of settlements can be avoided.  So in

25   this particular case, we don't have the Picard problem, right.

1   We're not just walking and claiming we represent the creditors.

2   We actually represent the creditors.  They contributed their

3   claims.  We have meetings with them.  We address all of these

4   issues.

5          They decide what claims we bring, how much, they

6   don't determine, you know what they shouldn't determine as a

7   client as opposed to as the attorney.  We advise them but all

8   of these policy issues that are actually brought up in the

9   cases, are resolved by having the investors contribute their

10  claims.  We represent them.  The liquidation trustee represents

11  them.  And these concerns are taken into account and bringing

12  these cases.  We report to them on what we're doing.

13         THE COURT:  All right.

14         MS. DEGROOTE:  Thank you, Judge Sherwood, we

15  appreciate your time.

16         THE COURT:  Thank you all.  Thank you both and for

17  the great papers and argument today.  I'm going to reserve

18  decision on this.  I think I might write something and I think

19  you're probably now about third in the queue of decisions that

20  we're working on.  I should be able to get it done shortly, not

21  you know within three to four weeks, I would say realistically.

22  But I would urge you to go to, without committing some of this

23  is going to survive your motion to dismiss.  I can, I'm almost

24  certain of that.

25         So I would urge you to schedule some time with the

1     mediator.  I don't know whether you're looking for 318,000

2     which is the fees or more than that but I was going to give a

3     decision but there's some things I really want to look at and I

4     have a gut reaction but I want to take the time to give, give

5     this the attention it deserved before I make a decision.  So

6     the decision is on reserve.  Just meet and confer, see if you

7     want to get with Judge Falk before I'm done.  I'm thinking

8     realistically about 30 days though.  And you can check in, you

9     know in two or three weeks and I'll let you know where we're at

10    how close we are.  All right?  Anything else?

11              MR. FLAHERTY:  No, Your Honor.

12              MS. DEGROOTE:  No, Your Honor.

13              THE COURT:  Thank you both again.

14              MS. DEGROOTE:  Thank you very much.

15              MR. FLAHERTY:  Thank you.

16              THE COURT:  For the great arguments and papers.

17              MS. DEGROOTE:  Thank you.

18              THE COURT:  Court is in recess.  We're off the

19    record.

20                            * * * * *

21

22

23

24

25

1            C E R T I F I C A T I O N

2            I, TRACY GRIBBEN, court approved transcriber, certify

3    that the foregoing is a correct transcript from the official

4    digital audio recording of the proceedings in the above-

5    entitled matter.

6

7    */s/ **TRACY GRIBBEN**___*

8

9

10   TRACY GRIBBEN TRANSCRIPTION, LLC     November 6, 2024

11                                       Date

12

13

14

15

16

17

18

19

20

21

22

23

24